**U.S. Department of Justice**



*United States Attorney*
*Eastern District of New York*

---

MKB:CAC/AL
F.#2010R00735

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 29, 2010

**BY HAND DELIVERY AND ECF**

The Honorable Jack B. Weinstein
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:  United States v. Charles Nagel
           <u>Criminal Docket No. 10-511 (JBW)</u>

      Trial in the above matter is scheduled for November 2, 2010.  The indictment charges the defendant with two counts of Interstate Stalking.  Specifically, the defendant is charged with stalking an actress, Kathryn Erbe (the "Victim"), who at the time was acting on the television program, <u>Law & Order Criminal Intent</u>.  The first count charges that the defendant traveled interstate with the intent to harass the Victim and, as a result of such travel, caused the Victim substantial emotional distress, in violation of 18 U.S.C. § 2261A(1).  The second count charges that the defendant, with the intent to harass the Victim, used the mail and internet to engage in a course of conduct that caused the Victim substantial emotional distress, in violation of 18 U.S.C. § 2261A(2).

      For the reasons set forth more fully below, the government seeks to admit the defendant's statements in the form of electronic messages sent from social networking websites known as MySpace and Facebook.[1]  The government further seeks to admit the corresponding third parties' messages to which the defendant

---

     [1]    A social network service is a website that focuses on building social relations among people who share similar interests or activities.  MySpace and Facebook are two such websites that provide a means for users to interact over the internet, such as by e-mail or instant messaging.  A social networking service essentially consists of a representation of each user (called a "profile"), links to other users and a variety of additional services.  On Facebook and MySpace, a profile can be created without any proof of identity, and can utilize any name the user chooses.  The only requirement is that the user enter a valid e-mail address to create the profile.

responded for the sole purpose of providing context for the defendant's admissions.

        The government also seeks to admit statements made by the Victim to other individuals in response to the defendant's actions, as well as other individuals' statements to the Victim about the defendant's actions.  These statements are not offered for the truth of the matter asserted, but to allow the jury to infer the Victim's distressed state of mind — an essential element of both counts.

I.   Facts

        The defendant is charged with stalking the Victim from July 15, 2008, when he first visited the Victim at the Law & Order Criminal Intent set, through March 24, 2010.  Throughout that time period, the defendant made ongoing statements about his feelings and intentions concerning the Victim.

        In the month leading up to his initial visit, the defendant corresponded on his "Chaz Rose"[2] MySpace account with others about his feelings for the Victim and his desire to befriend her outside of MySpace.

        On July 16, 2008, the day after the visit, the defendant posted a message on his MySpace "Chaz Rose" profile about his visit to the Law & Order Criminal Intent set.  In the message he described how he was "deeply hurt" by the Victim's unwillingness to hug him, how he "went through hell" to meet the actors and "got treated like shit."  On that same day, the defendant also corresponded on his MySpace account with a friend concerning his hurt feelings from his visit to the Law and Order set.  He believed that the Victim had her own Myspace page and he was concerned that she might delete him as a contact on MySpace. The defendant stated that "she might delete me...but if she does...she will get a piece of my mind...trust me."[3]

        The defendant's discussions about the Victim's supposed MySpace page and his feeling of rejection was the subject of

_____

        [2]    The government will establish that the defendant regularly uses the name "Chaz Rose," that he introduced himself to the Victim as "Chaz Rose" and that he referred to himself as "Chaz Rose" during the time period of the Indictment.

        [3]    All of the defendant's statements in this motion are direct quotes and include the original spelling and format.

2

almost daily correspondence on MySpace over the next seven
months.  On August 16, 2008, the defendant corresponded again
about why the Victim had not responded to him on MySpace and
hypothesized that perhaps the Victim's daughter was checking her
site.  He asked, "what if it was her 13 yo daughter..."

        Finally, on December 26, 2008, the defendant believed
that the Victim deleted her MySpace page.  He wrote:

        I HOPE IT WASN'T THE CHRISTMAS CARD I SENT
        HER, OR THE LAST EMAIL THAT I DON'T THINK SHE
        READ...I WILL MEET HER AGAIN HONEY! AND I
        WILL TALK TO HER ABOUT THIS!!! AND RIGHT AWAY
        I WILL SEND HER A LETTER...TO ALL HER NEW
        YORK ADDRESSES....I WILL GET TO THE BOTTOM OF
        THIS...I PROMISE MYSELF...

        The defendant's anger and frustration continued through
January and February 2009, leading up to the defendant's second
visit to the <u>Law & Order Criminal Intent</u> set on February 23,
2009.  On February 23, 2009, after trying to speak with the
Victim and being told to leave, the defendant made several calls
to the <u>Law & Order Criminal Intent</u> Production Office to complain
about how he had been wronged at the set.  Following that day, he
sent a 7 page letter to the Victim at the Production Office, and
another directly to the home where her ex-husband resides and
where her children reside part of the time.

        On May 18, 2009, the defendant sent a "friend request"
through  Facebook to the Victim's brother, Jonathan Erbe
("Jonathan").[4]  Jonathan initially accepted the defendant as a
friend.  In his first message, at 5:54 p.m., the defendant asked
Jonathan to forward a message to the Victim and described his bad
experience with the <u>Law & Order Criminal Intent</u> security guard on
July 15, 2008 and February 23, 2009.

_____

        [4]    A Facebook "friend request" is an electronic
communication on Facebook whereby a user requests that he/she be
added to another person's friend list.  If the user is accepted
as a friend, the user can post messages on the friend's "wall"
and see parts of the friend's page that are only accessible to
other friends, including a list of that person's other friends.
By viewing that list, the user can send a friend request to other
individuals on that list.  A wall is part of a Facebook user's
profile page where his/her friends can post messages.

A few minutes after the defendant asked Jonathan to forward the message to the Victim, he wrote another message to Jonathan describing himself and asked if the Victim had a MySpace page that she deleted.  Jonathan deleted the defendant as a "friend" and did not respond to the message.

Shortly after Jonathan deleted the defendant as a Facebook "friend," Jonathan received another message from the defendant asking why Jonathan deleted him instead of sending a response.  The defendant then proceeded to send Jonathan eighteen separate messages.  Most of the messages concerned Jonathan's failure to respond and contained continued repeated for Jonathan to pass along a message to the Victim.

Meanwhile, on his MySpace page, the defendant discussed with others the fact that he was reaching out to relatives of the Victim.  From September 2009 through March 2009, the defendant continued to correspond on MySpace about the Victim and his belief that she was once on MySpace but had deleted her page.

On March 4 and 5, 2010, the defendant contacted the Victim's 14-year-old daughter, referred to herein as "M.K.," through Facebook.  M.K. initially received a "friend" request from a girl named "Miranda Sinclair" who appeared, by her profile picture, to be a girl in her late teens or early twenties.[5]  M.K. accepted this request at first, but then subsequently deleted "Miranda Sinclair" as a friend.  After being deleted, the defendant, through "Miranda Sinclair," sent messages to M.K.  At some point, the "Miranda Sinclair" profile changed to the name "Cindy Momberger," and sent a message entirely about the defendant.  It began: "My Friend who is a warm hearted person and fantastic Music artist named Chaz Rose, met your Mom while filming last year..."  The message went on to discuss the visit to the Victim's set and the way that the defendant was treated by the security guards.  The message concluded by commenting that Chaz Rose believes the Victim "is the most Beautiful Woman in entertainment of all time.  He is a harmless romantic who wrote songs over her years ago.  He just wanted the truth to be know to your mom and sends his Best Regards :)."  Although the profile was now that of "Cindy Momberger," it was signed "Miranda S." Facebook records show that the "Cindy Momberger" (formerly "Miranda Sinclair") Facebook account was operated exclusively from the defendant's home.  Later that evening, the "Cindy

---

[5]     A profile picture is the featured picture of the Facebook user that appears each time a user sends a message or friend request, or posts a message on a wall.

Momberger" profile photograph was changed to a photograph of M.K. with a cockroach drawn on her face and the words, "I'm Ugly."

Three days later, on March 8, 2010, the same "Cindy Momberger" Facebook account sent a "friend" request to the Victim's brother, Jonathan. Jonathan immediately deleted the request and wrote on his Facebook account "wall" that Cindy Momberger is a stalker. Later that day Jonathan looked up Cindy Momberger's profile and saw that the profile picture had been changed to a photograph of Jonathan with a hand drawn penis and sperm on his face. The photograph made it appear as though Jonathan was holding a penis in his hand.

The day before the defendant contacted M.K. through the "Cindy Momberger" account, he corresponded with a talk show host, Gregory Mantell ("Mantell"). The defendant started corresponding with Mantell after the defendant had seen an interview with the Victim that Mantell conducted in January 2010. Mantell informed the defendant on Facebook that he intended to interview the Victim again on March 5, 2010, and the defendant asked Mantell to tell the Victim a message when he interviewed her.

Shortly after the Victim's daughter received the "Cindy Momberger" message about Chaz Rose, Mantell interviewed the Victim in Los Angeles. Towards the end of the interview, he mentioned her "number one" fan, Chaz Rose. The Victim immediately backed away from the camera, became extremely upset and motioned to Mantell to stop. The Victim then told Mantell that Chaz Rose was stalking her.

On March 6, 2010, the day after the interview, Chaz Rose contacted Mantell on Facebook to find out about the interview. When Mantell did not respond, the defendant wrote him again on March 12, 2010 and asked Mantell why he never answered his email and why he deleted him. The defendant sent similar messages on March 14 and March 16.

On March 19, 2010 at 8:38 a.m. the defendant wrote Mantell again about the fact that he had not responded to the defendant's messages: "why in the world are you ignoring me? did I say something wrong...you messaged me about what I would like to say to Katie erbe, I answered then this? you delete me, why can't you answer like a man??" Mantell once again did not respond. At 5:31 p.m. Mantell received a message from "Angela Paterson," with the message "u ah fagot ass cock smoking bitch that likes it up the ass." A few minutes prior to this message, at 5:26 p.m., "Angela Paterson" sent a Facebook message to a friend of Mantell's who appears on Mantell's Facebook page:

"Gregory Edward Mantell called you the N word girlfriend...he is
on your site.  thought i would let you know its not cool." The
"Angela Paterson" Facebook account was operated exclusively from
the defendant's home.

II.  Argument

    A.  Applicable Law

        Evidence must be relevant in order to be admissible.
Fed. R. Evid. 402.  At trial, evidence is relevant if it has "any
tendency to make the existence of any fact that is of consequence
to the determination of the action more probable or less probable
than it would be without the evidence."  Fed. R. Evid. 401.  The
standard for determining relevance is a liberal one.  Daubert v.
Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 587 (1993).
District courts have broad discretion to assess whether evidence
is relevant.  United States v. Perez, 387 F.3d 201, 209 (2d Cir.
2004).  A district court's relevancy determination will not be
overturned unless it is arbitrary or irrational.  Id. ("District
courts have broad discretion to assess the relevancy of evidence
and we will not overturn that determination unless it is
arbitrary or irrational.").

        Relevant evidence "may be excluded if its probative
value is substantially outweighed by the danger of unfair
prejudice," among other limited reasons.  Fed. R. Evid.  403.
For purposes of Rule 403, "[e]vidence is prejudicial only when it
tends to have some adverse effect upon a defendant beyond tending
to prove the fact or issue that justified its admission into
evidence."  United States v. Quattrone, 441 F.3d 153, 186 (2d
Cir. 2006) (quoting United States v. Figueroa, 618 F.2d 934, 943
(2d Cir.1980)); see also Old Chief v. United States, 519 U.S.
172, 172  (1997) ("The term 'unfair prejudice,' as to a criminal
defendant, speaks to the capacity of some concededly relevant
evidence to lure the factfinder into declaring guilt on a ground
different from proof specific to the offense charged.").

        Once evidence is determined to be relevant to proving
the offense charged, it is admissible unless precluded on other
grounds, such as hearsay.  Hearsay is a statement, other than one
made by the declarant while testifying at the trial or hearing,
offered in evidence to prove the truth of the matter asserted.
Pursuant to Rule 801(d)(2)(A), a statement is not hearsay if it
is a party's own statement and is offered by the party's
opponent.

Where a statement is deemed an admission, under Rule 801(d)(2), the surrounding statements providing essential context may also be considered.  United States v. Dupre, 462 F.3d 131, 137 (2d Cir. 2006) (investor e-mails demanding information from defendant and speculating that the investment project was fraudulent were properly admitted as non-hearsay evidence when offered to give context for the defendant's reply e-mails); United States v. Dambruck, 270 Fed. Appx. 30, 34 (2d Cir. 2008) (challenged statements by an unidentified male caller were admissible because they were not used to prove the truth of the matter asserted but rather to provide context for the defendant's statements); United States v. Tolliver, 454 F.3d 660, 666 (7th Cir.2007) ("Statements providing context for other admissible statements are not hearsay because they are not offered for their truth."); United States v. Barone, 913 F.2d 46, 49 (2d Cir. 1990) (the district court properly admitted evidence of an informant's recorded statements during a conversation with the defendant where they were presented not for the truth of the matter asserted, but to establish a context to assist the jury in understanding the recorded statements of the defendant, i.e., his admissions); United States v. Davis, 890 F.2d 1373, 1380 (7th Cir. 1989) (when a defendant has an out-of-court recorded conversation with a third party, and the defendant's statements are admissible as party admissions, the third party's statements to the defendant during the recorded conversation are admissible "as reciprocal and integrated utterances between two parties for the limited purpose of putting the response of the defendant in context of making them intelligible to the jury and recognizable as admissions"); Arista Records LLC v. Lime Group LLC, 2010 WL 2291485, *11 (S.D.N.Y. May 25, 2010) (portions of e-mails and postings written by non-parties were admissible because they provided essential context to the defendants' statements).

Furthermore, if third-party statements, such as email messages, are admitted to provide context and not for their truth, the Sixth Amendment's Confrontation Clause is not implicated.  Dupre, 462 F.3d at 137; United States v. Paulino, 445 F.3d 211, 216-17 (2d Cir. 2006).

B.   The Defendant's MySpace and Facebook Messages
     Are Admissible

          In the instant case, the defendant's MySpace messages
are relevant to prove the defendant's intent to harass the Victim
-- an essential element of the charged offenses.  The defendant's
MySpace messages contain the defendant's statements about (1) his
feelings towards the Victim and his intentions regarding her, (2)
his trips to New York to see her, (3) his anger and frustration
at the way that he was treated during his visit to the Victim's
set, and (4) the methods by which he attempted to contact the
Victim.  For example, on December 26, 2008, the defendant wrote
on MySpace that he was deeply hurt and confused as to why the
Victim deleted him from her supposed MySpace account, and he
promised that he would meet her again and talk to her about the
issue.  He also said that he would send her a letter to all of
her addresses and get to the bottom of the situation.  Indeed, as
soon as he saw her on February 23, 2009, the defendant asked the
Victim about her MySpace account.

          Accordingly, these MySpace messages provide direct
evidence of the defendant's state of mind, and prove that the
defendant was relentless in his quest to make a connection with
the Victim.  Because the statements have the "tendency to make
the existence of" the defendant's intent to harass the Victim
more probable, they are relevant and admissible as party
admissions pursuant to Fed. R. Evid. 801(d)(2)(A).

          Because the MySpace messages are relevant to a key
issue in the case, they are probative and cause no unfair
prejudice.  The government must prove that the defendant visited
the set of Law & Order Criminal Intent with the intent to harass
the Victim, and that he contacted her through the mail or
internet with the intent to harass.  Thus, the defendant's
thoughts about the Victim, including his frustration and anger
with her, are all necessary to prove his intent and are not being
admitted to "lure the factfinder into declaring guilt on a ground
different from proof specific to the offense charged."  See Old
Chief, 519 U.S. at 172.  Accordingly, the MySpace messages are
relevant and probative, and should be admitted.

          Similarly, the defendant's messages sent through
Facebook are relevant because they constitute the defendant's
"course of conduct" under Section 2261A(2) that led to the
Victim's substantial emotional distress.  When the defendant
could not reach the Victim, he contacted as many people as he

could who were connected to the Victim.[6]  These messages were all
passed on to the Victim and put her in fear for her safety and
the safety of her children.  Accordingly, the messages are
relevant to show the acts that caused the Victim substantial
emotional distress -- a key element of both charges.

        Moreover, the defendant's Facebook messages further
demonstrate the defendant's intent to harass.  Through Facebook,
the defendant continually contacted the Victim's relatives and
friends despite their refusal to respond to his messages.  For
example, after the Victim's brother, Jonathan, deleted the
defendant as a Facebook "friend" and refused to correspond with
him, the defendant sent eighteen separate messages in which he
continued to ask Jonathan to pass along his message to the
Victim.  When that did not work, the defendant eventually
contacted the Victim's 14-year-old daughter in an attempt to get
a message to the Victim.  And when the defendant realized that
the Victim's daughter also deleted him, he retaliated by changing
his fictitious "Cindy Momberger" profile picture to a defaced
photograph of the Victim's daughter.  Thereafter, when Jonathan
warned others that "Cindy Momberger" is a stalker, the defendant
changed "Cindy Momberger's" profile picture to a photograph of
Jonathan with a hand drawn penis and sperm on his face.
Furthermore, the defendant's action in continually sending
messages to the talk show host, Mantell, first as himself and
then as "Angela Paterson," despite Mantell's lack of response,
also demonstrate the defendant's intent to harass the Victim
through others.  Because these messages constitute proof of the
defendant's intent to harass the Victim and are his own
statements, they should be admitted.

        The defendant may argue that the "Cindy Momberger" and
"Angela Paterson" messages were sent by someone else in his home
- either his wife or his then 11-year-old daughter - and are thus
hearsay.  The government, however, will introduce evidence that
the messages were either sent directly from the defendant or, at
the very least, at the defendant's direction.  Thus, even if the
messages were physically sent by the defendant's wife or
daughter, they nevertheless contain the defendant's statements
and are admissible under Fed. R. Evid. 801(d)(2)(A).  The
defendant, of course, will not be precluded from arguing to the
jury that the defendant was not involved in sending the messages.
Those arguments, however, go to the weight of the evidence and
not to their admissibility.  Fed. R. Evid. 104(e).

---

        [6]    Indeed, the defendant admits in his MySpace messages
that he contacted relatives and friends of the Victim.

B.   The Third Party Messages Intertwined with the
Defendant's MySpace and Facebook Messages Are
Admissible

The third party MySpace and Facebook messages that are
intertwined with the defendant's statements are admissible to
provide context for the defendant's responses.  The statements
made by these third party recipients are not hearsay because they
are not being offered for the truth of the matter asserted.  They
are relevant to allow the jury to make sense of the defendant's
admissions.  For example, on August 16, 2008, the following
correspondence took place:

Third Party: I can't make excuses for Katie,
and even if she was busy, she should be able
to answer at least a yes or no question...so
I guess I don't know what to say.  Unless
there is a slight chance that this is not
actually her on MySpace, or if it IS her,
maybe she has some assistant running it, like
Davy or Micky does?  I dunno, I'm just
throwing things out...whatever the case, I'm
so sorry adn wish she'd respond to you.

Defendant: yeah she came on the other day
without updating her profile...like i
would'nt know she was on...she did'nt change
anything...forgetting about firefox

I don't about someone else checking her
space?  if it's a gut i would
understand...what if it was her 13 yo
daughter?

Third Party: oh my gosh, i never thought of
that angle, what if it is her daughter, that
would almost make sense?

As another example, on or about March 5, 2010, the following
correspondence took place on Facebook:

M.K.: why do you keep friending me? I don't
even know you

Cindy Momberger/Miranda Sinclair: Hi, i found
you on another site, you added me before,
then you deleted me i guess cos i only had
shark pics up, i just uploaded pics of me 4 u

10

to see, i'm a model & musician. i am new to
face book

<u>M.K.</u> yea that will be a no to re-friending. i
dont know you.

<u>Cindy Momberger/Miranda Sinclair</u>: My Friend
who is a warm hearted person and fantastic
Music artist named Chaz Rose, met your Mom
while filming last year and a security guy
from the dumb studio that fired the cast was
very nasty & rude to him, his Wife and
they're young Daughters for no reason at all
when they traveled a few hours drive together
as a family to meet you're Mom for
pictures/autograph, because they were fans
obviously and everyone knows the fans are
what makes it all possble! but that creepy
bodyguard or whatever it is, acted as though
he was there to hurt her which is absolutely
ridiculous,..he was just a serious fan. But
that particular bodyguard was known for
telling lies on strangers to do whatever it
took to get rid of fans around the set, so he
abused his power just as the studio did when
they were stealing some of the fan mail from
the talent, not to mention, over working
them. This security guy, think his name was
Joe Nuzzo fed my friend all this stuff,
saying Kathryn said this, Kathryn said that
(a bunch of negativity)...and fans want
to know why she would have judged him without
even knowing him? we all thought your mom
seemed like a sweet, down to earth kind
hearted actress who would be so cool with her
fans, but then the picture this security guy
painted in words changed allot of peoples
impressions for the worse. My friend
complained to the studio about this horrible
experience but only got the run around when
all he wanted was for Kathryn to know that he
is not some dangerous stalker and think
about...would he bring his family
along if he had twisted intentions? Of course
not. Chaz was such the fan that he thinks
Kathryn is the most Beautiful Woman in
entertainment of all time. He is a harmless
romantic who wrote songs over her years ago.

He just wanted the truth to be know to your
mom and sends his Best Regards :)

Sincerely, Miranda S.

The questions and answers by the third parties in these
communications, for example, are not offered for their truth;
they are provided to assist the jury in understanding the
defendant's statements.

Similarly, in Dupre, a fraud case, the court admitted
an exchange of e-mail messages between the defendants and a group
of investors. Dupre, 462 F.3d at 137. Those investors sent e-
mails demanding more information about a specific project and
speculated that the investment was a fraud. Id. The government
offered the investors' messages to provide context for the
defendants' admissions sent in response to them. Id. The Second
Circuit held that the investors' e-mail messages were not hearsay
because they were admitted not for the truth of the matter
asserted, but to provide context. Id. Here too, the MySpace
responses are admissible solely to put the defendant's responses
in context and are not being offered for the truth. Accordingly,
the full MySpace and Facebook messages, including the messages
from third parties with whom the defendant corresponded, should
be admitted.

D.   The Victim's Statements About the Defendant's
     Acts Are Admissible As Excited Utterances and
     Present Sense Impressions

Finally, the government seeks to admit out-of-court
statements made by the victim after she saw the defendant or
after she heard about his actions. The Victim's descriptive
statements should be admitted as excited utterances and present
sense impressions pursuant to Federal Rules of Evidence 803(1)
and 803(2).[7]

---

[7]   The victim's statements are relevant to show her state
of mind. Under Rule of Evidence 801(c), "where a statement is
offered as circumstantial evidence of the declarant's state of
mind rather than for the truth of the matter asserted, it is not
hearsay." United States v. Gotti, 457 F.Supp. 2d 395, 397
(S.D.N.Y. 2006) (citing Smith v. Duncan, 411 F.3d 340, 347 n.4
(2d Cir. 2005)). In addition, under Rule 803(3), the state of
mind exception to the hearsay rule allows introduction into
evidence "[a] statement of the declarant's then existing state of
mind . . . but not including a statement of memory or belief to

12

An "excited utterance" is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Fed. R. Evid. 803(2).

> [T]he rationale for this hearsay exception is that the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability. Unlike present sense impressions, an excited utterance need not be contemporaneous with the startling event to be admissible. Rather the length of time between the event and the utterance is only one factor to be taken into account in determining whether the declarant was, within the meaning of rule 803(2), "under the stress of excitement caused by the event or condition."

Jones, 299 F.3d at 112 (quotations, alterations and footnote omitted); United States v. Scarpa, 913 F.2d 993 (2d Cir. 1990) (affirming the introduction of excited utterances regarding an event the declarant witnessed at least five hours earlier).

A "present sense impression" is a statement "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Fed. R. Evid. 803(1). "Such statements are considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory." United States v. Jones, 299 F.3d 103, 112 (2d Cir. 2002).

Here, the Victim's statements to others directly following the defendant's actions are admissible as excited utterances. For example, on February 23, 2010, after the defendant tried to approach the Victim, the Victim told the Law & Order Criminal Intent security guards and other employees that were present that she was upset and wanted them to tell the defendant to leave. The Victim also contacted her business

---

prove the fact remembered or believed." Gotti, 457 F.Supp. 2d at 397. Additionally, "[i]t is well established . . . that statements offered for their effect on the listener are non-hearsay." Id. (citing Smith v. City of New York, 388 F. Supp. 2d 179, 182 (S.D.N.Y. 2005)).

manager at that same time to ask for his assistance.
Furthermore, the defendant's statements to NBC security, to the
private investigator that she hired and to the police about the
defendant's actions are all admissible as they occurred close in
time to the defendant's actions and contain the Victim's reaction
under the stress of excitement.

Moreover, the Victim's statements to a talk show host
in response to a question about "Chaz Rose" should also be
admitted as both excited utterances and present sense
impressions.  On March 5, 2010, shortly after the Victim learned
that the defendant contacted her daughter, she gave a videotaped
interview.  During this interview, when the talk show host
mentioned the name "Chaz Rose," the Victim immediately became
visibly upset, stopped the interview and explained that Chaz Rose
was stalking her.  These statements constitute excited utterances
and present sense impressions.  The statements are excited
utterances because they were made in direct response to the
statement about the defendant, at a time when the Victim had just
learned that the defendant contacted her daughter.  In addition,
the statements constitute present sense impressions because they
were made contemporaneously with the event, i.e., with the
Victim's emotional reaction.  Accordingly, the statements and the
corresponding video containing the Victim's reaction should be
admitted as non-hearsay.[8]

---

[8]     When the interview was recorded, there was a
malfunction with the sound.  Although the government is still
attempting to enhance the video so that the sound is heard, it
currently seeks to admit the video for the purpose of showing the
video of the Victim's reaction along with testimony about what
she said.

III. <u>Conclusion</u>

   Accordingly, the government respectfully request that it be permitted to introduce the above-described evidence at trial as evidence of the charged stalking crimes.

         Respectfully submitted,

         LORETTA E. LYNCH
         United States Attorney
         Eastern District of New York


By:       /s/
         Celia A. Cohen
         Allon Lifshitz
         Assistant U.S. Attorney
         (718) 254-6147/6164

cc: Robert Datner (By ECF)
  Clerk of the Court (By ECF)(JBW)

15