UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR-10-511 |
| – against – | Statement of Reasons Pursuant to 18 U.S.C. § 3553(c)(2) |
| CHARLES NAGEL, | |
| Defendant. | |



JACK B. WEINSTEIN, Senior United States District Judge:

A sentencing court shall "state in open court the reasons for its imposition of the particular sentence." 18 U.S.C. § 3553(c). If the sentence is not of the kind prescribed by, or is outside the range of, the sentencing guidelines referred to in section 3553(a)(4), the court shall indicate the specific reasons for imposing a sentence different from the guidelines. 18 U.S.C. § 3553(c)(2). These "reasons must also be stated with specificity in the written order of judgment and commitment." *Id.* Even though the mandatory nature of the guidelines has been excised and they are now "advisory," *see United States v. Booker*, 543 U.S. 220, 245-46 (2005), the sentencing court must still adhere to the requirements of 18 U.S.C. § 3553(c)(2). *United States v. Jones*, 460 F.3d 191, 197 (2d Cir. 2006).

The sentencing court's written statement of reasons shall be "a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Rattoballi*, 452 F.3d 127, 138 (2d Cir. 2006). Such a statement should demonstrate that the court "considered the parties' arguments and that it has a reasoned basis for exercising its own legal decisionmaking authority." *United States v. Cavera*, 550 F.3d 180, 193 (2d Cir. 2008) (quoting *Rita v. United States*, 551 U.S. 338, 356 (2007)) (internal quotations and alterations omitted).

1

On November 5, 2010, Charles Nagel was convicted by jury verdict of Count Two of a two-count indictment, which charged that between July 15, 2008 and March 24, 2010, the defendant, with the intent to harass and cause substantial emotional distress to a person in another State, used the mail, an interactive computer service and a facility of interstate commerce to engage in a course of conduct that caused substantial emotional distress to that person, in violation of 18 U.S.C. § 2261A(2).

Nagel was sentenced on September 7, 2011. The proceeding was videotaped in order to develop an accurate record of the courtroom atmosphere and the factors and considerations that a district court must evaluate in imposing a sentence under 18 U.S.C. § 3553(a). *See In re Sentencing*, 219 F.R.D. 262, 264-65 (E.D.N.Y. 2004) (utility of videotape on appeal).

The court finds the total offense level to be 22 and defendant's criminal history category to be category II, yielding a guidelines range of imprisonment of between 46 and 57 months. The calculation of the total offense level included a two-point enhancement for obstruction of justice, based on false statements defendant made during his trial. The offense carried a maximum term of imprisonment of five years. 18 U.S.C. § 2261(b). The guidelines range of fine was from $7,500 to $75,000. An order of restitution was mandatory. *See* 18 U.S.C. § 3663A; U.S.S.G. § 5E1.1.

Nagel was sentenced to five years' probation with continued intensive psychological treatment. His treating professional shall be under a duty to report any determination or threat of future stalking behavior. Any violation of the conditions of probation may result in incarceration. A $100 special assessment was imposed. Restitution was ordered in the amount of $42,838.38 owed to defendant's chief victim for expenses caused by defendant's criminal

acts. No fines were imposed because the defendant does not have any assets, and it is unlikely that he will have any in the future to pay a fine.

Respectful consideration was given to the sentencing guidelines, the Sentencing Commission's policy statements and all other factors listed under 18 U.S.C. § 3553(a) to ensure that the sentence is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). The court imposed a non-guideline sentence under 18 U.S.C. § 3553(a) and *Booker*.

The court considered the "nature and circumstances of the offense and the history and characteristics of the defendant." *See* 18 U.S.C. § 3553(a)(1). Interstate stalking is a serious offense. It is unacceptable to stalk public figures, either in person or through the use of emails and social networking web sites. Stalking causes significant emotional distress, not just to the direct victims of stalking, but also to the families of the victims – here the victim's child and brother.

In this case, the defendant used both traditional and technological means to stalk the victim, an actress on a popular network television show. His first attempts at stalking the victim were of the cyberstalking variety. He sent messages to what he mistakenly believed to be the victim's page on the social networking site MySpace. The victim did not have a MySpace page and did not receive his messages. When the victim did not respond, Nagel wrote, "I feel like dirt that was just kicked on the ground." Pre-Sentence Report ("PSR") ¶ 4.

In addition to attempting to correspond with the victim on MySpace, Nagel used MySpace to correspond with other individuals about the victim. He wrote to one individual: "I literally fantasize in my day and night dreams of sneaking up behind [the victim] while she's sitting down at the computer . . . I want to open her eyes, so I can look into hers and make love."

3

*Id.* Using the name "Chaz Rose," he sent another message to a fan of the television show stating that the victim had not responded to songs and letters he had written to her, and that this was causing him to become angry. The fan who received that message informed people affiliated with the show of the message, and the victim was made aware of it. *Id.* ¶ 6.

Eventually, Nagel's stalking activity took on other forms. On July 15, 2008, Nagel traveled from Pennsylvania to New York with his wife and two young daughters to visit a location in Manhattan where the victim's show was being filmed. Before filming began, Nagel met the victim for a short period of time. He attempted to hug the victim. Security guards intervened. *Id.* ¶ 5.

Despite the controversy between Nagel and the security guards, he remained on the set until filming concluded for the day. At that time, he again approached the victim and asked her to pose for a photograph with him and his two children. Initially the victim declined. However, when Nagel persisted, saying it was "for the sake of the children," the victim relented and posed for a picture. As the victim was being driven away from the set, Nagel ran along the opposite side of the street, waving at her. *Id.*

On February 23, 2009, Nagel again traveled from Pennsylvania to New York with his wife and children. In New York, he visited a production office affiliated with the television program. He then visited a set in Manhattan where the program was being filmed. At the set, he approached the victim, told her that his name was Chaz Rose, and asked if she remembered him. He also asked her about a MySpace page that he believed was hers. The victim recognized Nagel from the July 15, 2008 visit to the set and recognized Chaz Rose as the name of the person who had posted messages about her on MySpace.

The victim panicked. She left the area and notified a security guard that she was concerned about Nagel's presence. The security guard then told Nagel not to visit the set of the program again. *Id.* ¶ 7.

Following Nagel's second visit to the set, he repeatedly contacted the production office of the show complaining about the treatment he received. *Id.* ¶ 8, 9. In April 2009, Nagel sent a seventeen page handwritten letter to the victim at the production office under the name Chaz Rose. *Id.* ¶ 10. In the letter, Nagel wrote, among other things, the following:

- "When we met in person I was too shy to speak."

- "When I see your pictures, I am looking at a warm, understanding lady that has a heart and I am absolutely spellbound by your beauty, your [sic] so expressive, charming, adorable and sexy and your aged to perfection."

- "I know you have to be on your guard, I'm glad you are, but you don't have to be with me."

- "Please, I am begging and pleading with you to write me back, email or call to put my mind at ease and give my heart a rest from racing, let me know everything's alright."

- "I pray to GOD you will talk to me and end my heartache. It's only harmless communication. I am not trying to invade your privacy. I am a father and entertainer as well. I just want to be friends with you [], I'm not after anything else. Honest!"

- "[Another person was] saying I was a stalker simply because [I] mentioned how I'd like to meet you while filing like so many fans have and how I wanted to find

your address to request an autograph and add you to my Christmas card list that's all."

*Id.* In April 2009, Nagel, using the name Chaz Rose, sent another letter to the victim at her former home address, where her ex-husband currently resides. Upon receiving the letter, the victim became distressed, particularly because she had not known that the address, where her children sometimes reside, was publicly available. *Id.* ¶ 11, 12.

On March 4, 2010, Nagel used the social networking web site Facebook to send a message to the victim's daughter (then 14 years old). He used a Facebook account with the name "Cindy Momberger" to send the message, but signed the message "Miranda S." The defendant wrote that a "fantastic Music artiest named Chaz Rose" had met the victim, and that a security guard was rude to "Chaz Rose" and his wife and daughters. He also wrote that Chaz Rose is a "serious fan" of the victim and "a harmless romantic who wrote songs over her" and not some "dangerous stalker." The victim's daughter called the victim crying and described the message. As a precautionary measure, the victim's daughter and ex-husband deactivated the daughter's Facebook account. They later observed that the picture associated with the Cindy Momberger Facebook account had been changed to a photograph of the victim's daughter with a hand-drawn cockroach on her face and the phrase, "I'm ugly!" handwritten in a bubble next to her mouth. *Id.* ¶ 14, 15.

In May 2009, Nagel contacted the victim's brother, who shares the victim's last name, using the Chaz Rose Facebook account. The victim's brother did not respond. In March 2010, the Nagel used the Cindy Momberger Facebook account to send more messages to the victim's brother. The victim's brother responded at first, but then began to ignore the messages from the Cindy Momberger account as well. Subsequently, the picture associated with the Cindy

Momberger Facebook account was changed to a photograph of the victim's brother with a hand-drawn penis superimposed on it. *Id.* ¶ 16.

Nagel's conduct caused serious distress to the victim and her family. The victim testified at trial that she became distressed when she received the letter that Nagel sent to her ex-husband's home address. She testified that she was disturbed that he had the address of the home where her children stay on occasion. As for the letter itself, she testified that "just looking at the length of the letter disturbed [her]." The content of the letter was no less disturbing. In particular, she was disturbed that he called her Katie (something no one else does), by the anger apparent in his description of what happened to him and his family, and by the fact that he had a long conversation with another actor on the show. The victim was also upset by the handwritten letter Nagel sent to the show's production office. She was perturbed by the volume of the letter and the fact that it was written in different colored inks and styles, suggesting it had been written at many different times. *Id.* ¶ 20.

After reading this missive, the victim felt that the show she worked for was not doing enough to recognize the seriousness of the situation and to protect her. She contacted her business manager and asked him to introduce her to a security professional. She took additional security measure to protect herself and her family, including filing an official complaint with the Assistant District Attorney's Office in Brooklyn and hiring a private security firm at her own expense. *Id.* ¶ 23, 24, 27. The victim's brother, daughter and ex-husband were also terrified by the letters they received from Nagel. *Id.* ¶ 25, 26.

In light of the punishment already imposed and threatened if such conduct continues, a sentence of five years' probation reflects the seriousness of the offense and will promote respect for the law and provide just punishment. *See* 18 U.S.C. § 3553(a)(2)(A). Defendant has already

served 105 days in prison – 89 days in state custody and 26 days in federal custody – and has been on house arrest with an electronic shackle for approximately fourteen months. Incarceration was particularly harsh because he was kept isolated. In addition, defendant will be saddled with restitution payments, effectively for the rest of his life. Those payments will have a continuing deterrent effect.

Nagel suffers from serious psychiatric problems that require continuing treatment and supervision for purposes of rehabilitation. "[A] court may not impose or lengthen a prison sentence . . . to promote rehabilitation." *Tapia v. United States*, 131 S. Ct. 2382, 2392 (2011) (citing 18 U.S.C. 3582(a)). Treatment can generally be accomplished more effectively outside of prison than it can in prison. *United States v. Brennan*, 468 F. Supp. 2d 400, 408 (E.D.N.Y. 2007); *see also United States v. Chase*, 340 F.3d 978, 991 (9th Cir. 2003) ("[A]lthough incarceration is one way to eliminate a threat of imminent harm, in many cases treatment is a longer-lasting and more effective solution."). With such treatment, and considering the other deterrent aspects of defendant's sentence, he is unlikely to pose any further threat to the victim, her family, or the general public.

The court is concerned that, according to psychiatric testimony, further incarceration might cause the defendant to inflict serious harm upon himself. At the sentencing hearing, Dr. Glen Skoler, a psychologist who performed extended clinical testing on defendant, opined that defendant would pose a high risk of suicide if he were incarcerated.

Under section 3553(a)(2)(B), there are two major considerations: specific and general deterrence. General deterrence is satisfied with the sentence imposed. The sentence will send a clear message that any activity constituting interstate stalking will result in a substantial penalty. Specific deterrence is achieved through extensive restitution and a significant term of probation.

It is unlikely that this defendant will engage in further criminal activity. His strong commitment to his wife and two young daughters, the deterrent effect of the incarceration he has served to date, the restitution he will be required to pay for the foreseeable future, and the ongoing monitoring and treatment that he will be subject to as a condition of his parole should prevent dangers to the public. Any deviation from acceptable behavior shall be promptly reported to the court, and is likely to lead to a long period of incarceration.

Jack B. Weinstein
Senior United States District Judge

Dated: September 9, 2011
      Brooklyn, New York